OPINION
{¶ 1} Appellant, Marcus Pierson ("Pierson"), appeals from the decision of the Ashtabula County Court of Common Pleas granting summary judgment to appellees, Norfolk Southern Corp ("NSC"), et al.
 {¶ 2} In October of 1989, Pierson began employment at the Ashtabula Coal Dock. The dock serves as a loading point for ships hauling coal on and around the Great Lakes. Since June 1, 1999, Pierson has been under NSC's employment at the dock. Until approximately January 1, 2000, Pierson was employed as a maintenance mechanic. A maintenance mechanic's duties vary and are somewhat open-ended; however, in general, a maintenance mechanic repairs and services equipment and structures and performs general operations and maintenance work at the dock.[1] From the evidence set forth in the record, the responsibilities of a maintenance mechanic necessarily involve a broad range of rigorous job duties.
 {¶ 3} In December of 1999, Pierson visited his treating physician, Dr. Robert A. Dlwgosh for management of his diabetes. During his visit, Pierson indicated he was experiencing chest pains which Dr. Dlwgosh characterized as nonexertional and not typical of angina (chest pains associated with ischemia).
 {¶ 4} After conducting the above examinations, Dr. Dlwgosh referred Pierson to the Cleveland Clinic for a cardiac catheterization. At the Cleveland Clinic, Pierson was treated by Cardiologist and Assistant Professor of Medicine, Dr. Michael Lincoff. After completing the catheterization, Dr. Lincoff concluded that Pierson had one significant lesion on his heart muscle; however, in his view, Pierson's chest pain was not the result of myocardial ischemia.
 {¶ 5} On or about January 10, 2000, Pierson was released by his treating physicians to return to work. There is no indication that either was aware of the full extent of Pierson's physical duties. However, Dock Supervision referred the matter to NSC Medical Department in Norfolk, Virginia. NSC Medical Director, Dr. C. Ray Prible, received and reviewed Pierson's medical records sent by his treating physicians. From these records and his interpretation of NSC's medical guidelines,[2] Dr. Prible authorized the issuance of a letter blocking Pierson's return to work. Dr. Prible concluded: "[Pierson's] medical condition, coronary artery disease, does not permit safe performance of the essential functions of [his] position and is thus inconsistent with our medical guidelines."
 {¶ 6} In response, Pierson's treating physicians offered formal letters detailing their belief that Pierson was capable of returning to work without restrictions. Dr. Dlwgosh stated, in relevant part:
 {¶ 7} "Mr. Pierson is a 43 year old male with good exercise tolerance and normal cardiac function. He has distal stenosis of the LAD with a small amount of myocardium at risk. This lesion can be managed medically without significant problems. I feel that Mr. Pierson is not disabled and have released him back to work. I see no medical reason that Mr. Pierson cannot continue his current employment."
 {¶ 8} Moreover, Dr. Lincoff wrote: "I performed cardiac catheterization of Marcus Pierson on December 31, 1999. He has mild to moderate coronary artery disease. His heart muscle strength is normal. He can return to work without limitation. His cardiac condition at the current time should not interfere with his ability to carry out his duties at work."
 {¶ 9} Notwithstanding these conclusions, Dr. Prible maintained that the: "[m]edical guidelines do not permit employees with reversible cardiac ischemia to hold safety-sensitive positions or those of a non-sedentary nature. Unfortunately, these types of tasks are an essential function of Mr. Pierson's job as longshoreman. As a result of his documented, reversible cardiac ischemia from coronary artery disease, Mr. Pierson does not meet this guideline and was medically disqualified from service, effective January 10, 2000."[3] On this date, Pierson was blocked from returning to work as a maintenance mechanic.
 {¶ 10} Subsequent to his disqualification, Pierson contacted Dr. Prible for advice on how or when he could return to work. Dr. Prible told Pierson that he could look for another position at NSC for which he was qualified and could perform safely. Eventually, Dr. Prible revised Pierson's restrictions and recommended that Pierson be limited to pushing, pulling, or carrying no more than 25 pounds and that he be precluded from operating equipment that was safety sensitive. Pierson has maintained, throughout this litigation, that he is neither disabled nor otherwise unable to perform any duties asked of him on the dock.
 {¶ 11} After nearly three and one half months of involuntary leave under the FMLA, Pierson was permitted to return to work as an operations mechanic rather than a maintenance mechanic. Although Pierson retained the same general benefits as he had when he was a maintenance mechanic, the record reflects that he lost his income for the period he was disqualified. Moreover, when he was allowed to return, Pierson lost overtime opportunities and the opportunity to trade shifts. From the record, such benefits appear strictly associated with the position of maintenance mechanic.
 {¶ 12} On September 22, 2000, Pierson filed the instant action against NSC and Bryant Johnson, NSC's superintendent at the Ashtabula Coal Dock. Pierson alleged that the restrictions imposed by NSC in response to his medical condition and NSC's medical guidelines constituted disability discrimination under R.C. 4112, et seq., and violated Ohio public policy issuing from Ohio's Civil Rights Act. On April 4, 2002, NSC and Johnson, moved for summary judgment. On June 10, 2002, the trial court granted NSC's and Johnson's motion for summary judgment on both of Piersons claims. Pierson now appeals alleging the following assignments of error for our consideration:
 {¶ 13} "[1.] The trial court erred in granting summary judgment to defendants-appellees by concluding that there were no facts to support the claim that defendants regarded plaintiff as disabled.
 {¶ 14} "[2.] The trial court erred in ignoring the factual record and concluding that plaintiff-appellant could not safely perform his job.
 {¶ 15} "[3.] The trial court erred in concluding that plaintiff-appellant did not suffer an adverse employment action."
 {¶ 16} Initially, we note that an appellate court reviews a trial court's grant of summary judgment de novo. Grafton v. Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105. In applying the de novo standard, we review the trial court's decision independently and without deference to the trial court's determination. Brown v. Scioto Cty. Bd. of Cmmrs. (1993), 87 Ohio App.3d 704, 711. Summary judgment is proper when: (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come but to one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence construed most strongly in his favor. Id. The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Dresher v. Burt (1996), 75 Ohio St.3d 280,292-293.
 {¶ 17} Because summary judgment is a procedural device to terminate litigation it must be awarded with caution, resolving any doubts in favor of the non-moving party. Murphy v. Reynoldsburg (1992), 65 Ohio St.3d 356,358-359. In sum, the central issue on summary judgment is, "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc. (1986), 477 U.S. 242, 251-252.
 {¶ 18} By way of background, the instant appeal is premised upon allegations of disability discrimination. It is unlawful for an employer to discriminate against an employee because of a "disability" with respect to, "terms, conditions, or privileges of employment or any other matter directly or indirectly related to employment." R.C. 4112.02(A). In order to establish a prima facie case of disability discrimination, the party seeking relief must demonstrate the following: (1) that he or she has or had a disability; (2) that an adverse employment action was taken by an employer, at least in part, because of the individual's disability; and (3) even though that person is disabled, he or she can safely and substantially perform the essential functions of the job in question. Yamamoto v. Midwest Screw Products, 11th Dist. No. 2000-L-200, 2002-Ohio-3362 at ¶ 18, citing, Hood v. Diamond Products Inc. (1996), 74 Ohio St.3d 298, paragraph one of the syllabus. Under these elements, appellant must first establish that he is disabled. Lanterman v. Columbia Gas of Ohio, Inc., 7th Dist. No. 01 CO 54, 2002-Ohio-5224 at ¶ 12.
 {¶ 19} R.C. 4112.01(A)(13) defines disability as a:
 {¶ 20} "physical or mental impairment that substantially limits one or more major life activities, including the functions of caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working; a record of a physical or mental impairment; or being regarded as having a physical or mental impairment."
 {¶ 21} The Ohio Administrative Code amplifies this definition by including in the definition of a "disabled person" anyone: "who presently has a disability as defined by division (A)(13) of section 4112.01 of the Revised Code or any person who has had a disability as defined by division (A)(13) of section 4112.01 of the Revised Code, who no longer has any functional limitation, but who is treated by a respondent as having such a disability, or any person who is regarded as disabled by a respondent." Ohio Adm. Code 4112-5-02(H).
 {¶ 22} Because Ohio disability discrimination law is similar to the federal Americans with Disabilities Act ("ADA"), Ohio courts may seek guidance in the interpretation of the Ohio disability discrimination law from regulations and cases that interpret the ADA. Columbus Civ. Serv. Comm. v. McGlone (1998), 82 Ohio St.3d 569, 573; Shaver v. Wolkse 
Blue (2000), 138 Ohio App.3d 653, 663; Lanterman, supra, at ¶ 13.
 {¶ 23} In his first assignment of error, Pierson contends that the trial court erred in concluding that there were no issues of material fact with respect to his claim that NSC regarded him as disabled. "If the employer perceives the employee as `disabled' or suffering from a disability, the employee is `disabled' for purposes of R.C. 4112.02(A) regardless of whether the employee suffers from a disability as defined by R.C. 4112.01(A)(13)." Yamamoto, at ¶ 32, citing, Markham v. Earle M. Jorgensen, Co., (2000), 138 Ohio App.3d 484, 500 (concurring opinion). Accordingly, an individual bringing an action for employment discrimination may establish the first element of his prima facie case by demonstrating that the employer regarded him as disabled. Yamamoto, supra, at ¶ 32.
 {¶ 24} The "regarded as" aspect of the definition of "disability" is "intended to allow individuals to be judged according to their actual capacities, rather than through the scrim of `myths, fears, and stereotypes' accruing around a perceived impairment." Mahon v. Crowell (6th Cir. 2002), 295 F.3d 585, 592, citing Sutton v. United Air Lines, Inc. (1999), 527 U.S. 471, at 489-490. An individual is "regarded as" having a disability when, "(1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities." Sutton, supra, at 489. A covered entity is defined as an employer, employment agency, labor organization, or joint labor management committee. Yamamoto, supra at ¶ 34, citing Section 1630.2(b), Title 29, C.F.R.
 {¶ 25} In rendering summary judgment in NSC's favor, the trial court concluded that there was no evidence that appellee: "mistakenly `regarded' him as disabled, pursuant to the definition of `disabled' as set out in R.C. 42112.01 (sic), as Pierson was not limited by his ischemia or coronary artery disease in any major life activity, nor did NSC believe that this condition prevented him from performing a broad range of jobs in various classes in his employment."
 {¶ 26} That is, although Pierson was disqualified, NSC eventually cleared his return by placing restrictions upon him. The restrictions modified Pierson's duties, but did not bar him from working. Thus, because Pierson was able to work (by virtue of NSC's accommodations), he was not substantially limited in any major life activity. Therefore, the trial court determined that NSC did not regard Pierson as disabled. We disagree.
 {¶ 27} In the case sub judice, Pierson was disqualified from his job as a maintenance mechanic; as indicated above, a maintenance mechanic is one who engages in many and various projects, a list of which could scarcely be thoroughly enumerated. As such, Pierson's disqualification and subsequent reassignment to a restricted position raises material issues of fact regarding whether NSC's limitations did restrict Pierson's ability to perform a class of jobs or a broad range of jobs.
 {¶ 28} There are material issues of fact as to whether NCB's beliefs regarding Pierson's capacity to do his job were mistaken or accurate. Moreover, there are genuine issues of material fact regarding whether Pierson's ischemia was non-limiting such that any restrictions imposed upon his capacity to do his job were mistaken.
 {¶ 29} In sum, a fact finder could reasonably conclude that the above actions indicate NSC regarded Pierson as disabled. Specifically, it is undisputed that Dr. Prible never performed a personal evaluation upon appellant and his knowledge of a longshoreman's duties was, at best, skeletal. Nevertheless, Dr. Prible concluded appellant was impaired and subsequently disqualified him from his job as longshoreman. Although he ultimately revised this assessment, appellant was permitted to return only with severe restrictions upon his ability to perform a broad range of jobs.
 {¶ 30} Further, NSC's medical guidelines do not expressly prohibit employees with reversible cardiac ischemia from holding safety sensitive positions or those of a non-sedentary nature. As such, Dr. Prible's evaluation was not required by the very standards on which his conclusions were based. Thus, there is a material issue of fact as to whether NSC mistakenly believed that appellant had a physical impairment substantially limiting one or more major life activities.
 {¶ 31} Therefore, Pierson's first assignment of error has merit.
 {¶ 32} For purposes of continuity, we shall next address appellant's third assignment of error. In his third assignment of error, appellant maintains that the trial court erred when it concluded, as a matter of law, that appellant did not suffer an adverse employment action. Specifically, appellant argues that appellee's action of disqualifying him from his position on the dock from January 1, 2000 to April 25, 2000 cost him not only wages but, upon his return, he was denied overtime opportunities, weekend work, as well as other incidental benefits. Insofar as appellee's disqualification (and subsequent reinstatement) denied him both wages and benefits, there is a genuine issue of material fact as to whether appellant experienced an adverse employment action.
 {¶ 33} An adverse employment action need not result in pecuniary loss, but must materially affect the appellant's terms and conditions of employment. Peterson v. Buckeye Steel Casings (1999), 133 Ohio App.3d 715,727. "`Factors to consider when determining whether an employment action was materially adverse include `termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [or] significantly diminished material responsibilities. * * *' Changes in employment conditions that result merely in inconvenience or an alteration of job responsibilities are not disruptive enough to constitute an adverse employment action.'" Hart v. Columbus Dispatch Printing Co. 10th Dist No. 02AP-506, 2002-Ohio-6963, at ¶ 35, quoting Peterson, supra.
 {¶ 34} In the instant case, Pierson testified that he was disqualified from work for the period between January 1, 2000 and April 25, 2000. During this time appellant stated that he received no wages, but for $276.00 in unemployment. Moreover, Pierson noted that, upon reinstatement with restrictions, he was no longer offered opportunities for overtime, for weekend work, or shift trading, i.e., moving from one shift to another. Insofar as Pierson's ischemia prompted the initial disqualification and ultimate restrictions on his ability to work, there is an issue of material fact as to whether Pierson suffered an adverse employment action as a result of his alleged impairment. Thus, Pierson's third assignment of error has merit.
 {¶ 35} Finally, Pierson alleges, in his second assignment of error, that the trial court erred when it concluded that appellant could not safely perform his job. Because there are material issues of fact as to whether NSC mistakenly believed Pierson had a physical impairment that substantially limited a major life activity, there are similar issues regarding whether Pierson could safely perform his job. That is, if a factfinder determined that NSC's perception of Pierson's ischemia was mistaken, then the factfinder could also determine that Pierson could safely perform his job. Because the issue of whether Pierson could safely perfom his duties is necessarily tied to the validity of NSC's perceptions regarding Pierson's ischemia, his second assignment of error also has merit.
 {¶ 36} In conclusion, this is a case that on its facts could go either way. This means that a jury's verdict in a properly tried case would be sustained regardless of whether the verdict was in favor of Pierson or in favor of NSC. See Wexler v. White's Fine Furniture (6th Cir. 2003), 317 F.3d 564, 578. However, that is precisely the point. The conflicting evidence and the inferences that can be drawn therefrom raise genuine issues of material fact that preclude the grant of summary judgment in the case before us. Although NSC urges us to affirm the trial court's decision, their arguments do not diminish the contrary evidence to the point that "it is so one-sided that [NSC] must prevail as a matter of law." Anderson, supra, at 251-252.
 {¶ 37} For the foregoing reasons, the decision of the Ashtabula County Court of Common Pleas is reversed and this matter is remanded for further proceedings in accord with this opinion.
Judith A. Christley and William M. O'Neill, JJ., concur.
[1] During his deposition, appellant validated a non-exclusive list of the various jobs which he performed as a maintenance mechanic. The list included cleaning the shop, offices, lunch room and other building areas; loading and unloading trucks; changing rollers weighing approximately 100 to 200 pounds, on the belt line; extinguishing fires on rollers and inclines; climbing and walking the inclines from the bottom of the transfer point to the top of the coal silos, which could range from 2 feet to 110 feet above ground; carrying items varying in weight and size while walking up inclines and catwalks such as to the top of the silo; changing lights 110 to 120 feet above ground and changing water tower heads from 110 to 120 feet above ground; hand shoveling coal; changing wear plates on the duper hopper, the top of the coal silos, and all transfer points; (wear plates are removed and installed with two or more men and can weigh anywhere from 10 to 400 pounds); there are various pulling and pushing, heavy lifting, walking and working in confined areas, long hours of manual labor, operations and maintenance of any and all equipment.
[2] NSC's medical guidelines state: "Qualification recommendations must be based on an individualized assessment of each case, including both the individual's personal medical condition and the essential job functions of the specific position." Section 3.1.1.2, entitled "Coronary Artery Disease in Applicants/Employees with Safety Sensitive and/or Non-Sedentary Positions" states: "Applicants/employees in safety sensitive and/or non-sedentary positions who have known coronary artery disease, or who are status post a myocardial infarction or cardiac procedure such as coronary artery by-pass or angioplasty will be given individual consideration for fitness for service." Pierson underscores that although the guidelines themselves appear to require individualized assessments, Dr. Prible's review of Pierson's case entailed merely an examination of his medical charts.
[3] The record reflects that the medical guidelines did not specifically require Pierson to be disqualified or restricted due to his reversible ischemia. Rather, Dr. Prible's conclusions on this matter were a result of his "interpretation" of the medical guidelines.